OPINION OF THE COURT
George B. Ceresia, Jr., J.
The individual petitioners are family members and/or friends of inmates incarcerated within the New York State prison system. The Office of Appellate Defender and the New York State Defenders Association are nonprofit organizations which provide legal services to state inmates. All petitioners are or have been recipients of collect telephone calls from state inmates. The petitioners argue that they are being overcharged for the collect telephone calls which they receive.
Pursuant to a contract dated April 1, 1996 with MCI,[1] the New York State Department of Correctional Services (hereinafter DOCS) instituted a program that permitted inmates to make telephone calls to designated friends or family from coinless telephones by use of a collect call system. The contract with MCI was the result of a competitive bidding process. Bidders were required to meet extensive security and monitoring requirements, which included the capacity to block, store and record all phone calls. The bid proposal contained a requirement that DOCS receive a commission of no less than 47% of the gross monthly revenue generated by these calls. As required by statute, MCI filed its interstate telephone rates with the Federal Communications Commission, and filed its intrastate rates with the Public Service Commission (hereinafter PSC; see 47 USC § 201; Public Service Law § 92). As relevant here, on December 16, 1998, the PSC approved the proposed rates, which included a 60% commission paid to DOCS from the proceeds collected by MCI.
In April 2001, MCI and DOCS entered into a new contract that required MCI to continue charging the same rate, but decreased the commission collected by DOCS from 60% to 57.5% of MCI’s gross annual revenues. In May 2003, DOCS and MCI agreed to amend the 2001 contract, to leave the 57.5% commission intact, but introduce a flat rate for all calls without regard to the time of day or distance of the call (160 per minute with a *777 single surcharge of $3 per call). The State Comptroller approved the amendment on July 25, 2003. On August 14, 2003 MCI filed a revised tariff with the PSC which incorporated the change. Although there was no formal hearing, several individuals and organizations, including two of the petitioners in the instant proceeding, filed timely comments with the PSC. They argued, among other things, that the inmate telephone system violated the constitutional rights of DOCS inmates and their families.[2] In its order dated October 30, 2003, the PSC determined that while it had jurisdiction over MCI, it did not have jurisdiction over DOCS, because the latter is not a telephone corporation. Based on the foregoing, it declined to review the portion of the tariff attributable to the 57.5% commission MCI was to pay to DOCS. The PSC approved as just and reasonable what it termed the “jurisdictional” portion of the rate, which corresponded to the 42.5% portion retained by MCI. The PSC directed MCI to file new tariffs which separately identified the unreviewed rate and the “jurisdictional” rate. Both rates were included in the amended tariff subsequently filed with the PSC. On February 26, 2004, the petitioners commenced the instant combined action/proceeding to challenge the 57.5% commission paid by MCI to DOCS. The petition sought judgment: (1) declaring the 57.5% commission to be illegal and a violation of petitioners’ constitutional rights; (2) enforcing the PSC’s October 30, 2003 order and permanently enjoining DOCS and MCI from imposing charges above the “jurisdictional rate” filed with the PSC; (3) permanently enjoining DOCS and MCI from enforcing certain portions of their contracts; (4) directing DOCS and MCI to provide an accounting; (5) directing DOCS and MCI to make certain refunds to petitioners and class members; and (6) awarding costs and disbursements of the proceedings.
Upon commencement of the instant proceeding, the respondents made a motion to dismiss pursuant to CPLR 7804'(f) and 3211 (a) on grounds, inter alia, that the proceeding was time-barred under CPLR 217. The court, by decision/order/judgment dated October 8, 2004, found that the proceeding was untimely and dismissed the petition. The Third Department, Appellate Division, affirmed (see Walton v New York State Dept. of Correctional Servs., 25 AD3d 999 [2006]). The Court of Appeals modified the order of the Appellate Division by reinstating the second through fifth causes of action, holding that the proceed *778 ing as to these causes of action (which allege violations of petitioners’ constitutional rights) was timely (see Walton v New York State Dept. of Correctional Servs., 8 NY3d 186 [2007]). The Court of Appeals remitted the matter to Supreme Court to determine whether the constitutional claims state a cause of action.[3]
It is well settled that, in response to a motion pursuant to CPLR 3211, pleadings shall be liberally construed, the facts as alleged accepted as true, and every possible favorable inference given to plaintiffs (see Nonnon v City of New York, 9 NY3d 825 [2007]; Leon v Martinez, 84 NY2d 83, 87 [1994]). On such a motion, the court is limited to examining the pleading to determine whether it states a cause of action (see Guggenheimer v Ginzburg, 43 NY2d 268, 275 [1977]). In examining the sufficiency of the pleading, the court must accept the facts alleged therein as true and interpret them in the light most favorable to the plaintiff (see Nonnon v City of New York, supra; Leon v Martinez, supra). Only affidavits submitted by the plaintiff in support of his or her causes of action may be considered on a motion of this nature (see Rovello v Orofino Realty Co., 40 NY2d 633, 635-636 [1976]). On such a motion, the court’s sole inquiry is whether the facts alleged in the complaint fit within any cognizable legal theory, not whether there is evidentiary support for the complaint (see Leon v Martinez, supra; Pietrosanto v NYNEX Corp., 195 AD2d 843, 844 [3d Dept 1993]).
In addition, where declaratory relief is requested, “[i]n deciding a motion to dismiss for failure to state a cause of action, a court must liberally construe the allegations to determine if a bona fide justiciable controversy exists” (Matter of Niagara Mohawk Power Corp. v State of New York, 300 AD2d 949, 952 [3d Dept 2002], citing Matter of Schulz v New York State Legislature, 230 AD2d 578, 582 [1997], lv denied 95 NY2d 769 [2000]).
Violation of Power To Tax (Count II)
Count II of the petition alleges that DOCS exceeded its power by imposing an unlawful tax upon the petitioners through the collection of the DOCS commission, in violation of New York *779 Constitution, article III, § l[4] and article XVI, § l.[5] The respondents maintain that the DOCS commission is not a tax, but rather is part of a tariff which was approved by the PSC.
Public Service Law § 97, entitled “Rates, rentals and service,” recites as follows:
“1. Whenever the commission shall be of opinion, after a hearing, had upon its own motion or upon a complaint that the rates, charges, tolls or rentals demanded, exacted, charged or collected by any . . . telephone corporation subject to its jurisdiction for the transaction of messages or communications by . . . telephone or for the rental or use of any . . . telephone line . . . wire, appliances, apparatus or device or any telephone receiver, transmitter, instrument, wire, cable, apparatus, conduit, machine, appliance or device or any telephone extension or ex-tention system or that the rules, regulations or practices of any . . . telephone corporation affecting such rates, charges, rentals or service are unjust, unreasonable or unjustly discriminatory or unduly preferential or in anywise in violation of law, or that the maximum rates, charges or rentals chargeable by any such . . . telephone corporation are insufficient to yield reasonable compensation for the service rendered, the commission shall, with due regard, among other things, to a reasonable average return upon the value of the property actually used in the public service and to the necessity of making reservation out of income for surplus and contingencies, determine the just and reasonable rates, charges and rentals to be thereafter observed and in force as the maximum to be charged, demanded, exacted or collected for the performance or rendering of the service specified notwithstanding that a higher or lower rate, charge or rental has been theretofore prescribed by general or special statute, contract, grant, franchise condition, consent or other agreement and shall fix the same by order to be served upon all telegraph corporations and *780 telephone corporations by which such rates, charges or rentals are thereafter to be observed, and thereafter no increase in any rate, charge or rental so fixed shall be made without the consent of the commission. Any such change in rate, charge or rental shall be upon such terms, conditions or safeguards as the commission may prescribe.”
Distilled to its essence, Public Service Law § 97 (1) recites that the PSC “shall . . . determine the just and reasonable rates . . . to be thereafter observed and in force as the maximum to be charged . . . notwithstanding that a higher or lower rate, charge or rental has been theretofore prescribed by general or special statute, contract, grant, franchise condition, consent or other agreement” (emphasis supplied).
From the foregoing, it would appear, on the very face of the statute, that the Public Service Commission has full authority, indeed paramount authority, to review a given telephone rate. This is borne out by the language employed by the Court of Appeals in Matter of Cahill v Public Serv. Commn. (69 NY2d 265 [1986]):
“A public utility is franchised by the State (Public Service Law §§ 68, 99) to provide services to the public at just and reasonable rates (Public Service Law §§ 65, 91) in exchange for a proper return on its investment (see, Public Service Law § 97; Matter of Village of Boonville v Maltbie, 272 NY 40). Operating as a monopoly (see, People ex rel. New York Edison Co. v Willcox, 207 NY 86, 93-94), it is subject to regulation by the PSC (Public Service Law §§ 66, 94). The PSC oversees the utilities for the public good as an exercise of the State’s police powers (People ex rel. New York Elec. Lines Co. v Squire, 145 US 175) and has exclusive authority to determine just and reasonable rates (Public Service Law § 66 [12]; § 92 [2]). It establishes maximum rates which may not be exceeded (Public Service Law § 65 [1]; § 91 [1]). In fact, no utility may charge more or less than the rates established by the PSC (see, Public Service Law § 66 [12]; § 92 [2]).” (Matter of Cahill v Public Serv. Commn. at 271-272; see also Matter of New York Tel. Co. v Public Serv. Commn. of State of N.Y., 271 AD2d 35, 39 [3d Dept 2000], lv denied 95 NY2d 762 [2000].)
Notably, it has been held that it is appropriate for the PSC, in reviewing a proposed tariff, to examine the utility’s underlying *781 expenses to determine if they are just and reasonable. For example, in Matter of General Tel. Co. of Upstate N.Y. v Lundy (17 NY2d 373 [1966]), it was held that it was proper for the PSC to review, and then disallow, a portion of a telephone company’s proposed rate increase which was attributable to contractual overcharges from its affiliate. The Court of Appeals stated:
“The [public service] commission has been empowered to determine ‘just and reasonable’ telephone rates (Public Service Law, § 91, subd. 1; § 97, subd. 1) and, as the United States Supreme Court noted many years ago, the rate-making power is" not ‘subservient to the discretion of [a utility] which may, by exorbitant and unreasonable salaries, or in some other improper way, transfer its earnings into what it is pleased to call “operating expenses.” ’ (Chicago & Grand Trunk Ry. Co. v. Wellman, 143 U. S. 339, 346, supra.) Particularly when those expenses arise out of dealings between affiliates, the commission ‘not only [has] the right but the duty to scrutinize [such] transactions closely’. (Matter of Long Beach Gas Co. v. Maltbie, 264 App. Div. 496, 504, affd. 290 N. Y. 572, supra.) And, in this connection, we find significance in the statutory requirement that the agency be given access to the records of all transactions between telephone companies and their affiliates (Public Service Law, § 110, subd. 2).
“So far as rate making is concerned, it is of no consequence that the Legislature has declined to go further and provide for regulation by the commission of the very terms and conditions of all contracts between affiliates. The primary purpose of such regulation is to protect the corporation’s treasury and to preserve its financial integrity. The function of the rate-making power, however, is to protect the utility’s rate payers. In the proper exercise of that power, the commission does not require the authority to invalidate contracts. All that is required — and, indeed, all that is given — is the authority to disregard unwarranted payments to affiliates when calculating the ‘just and reasonable’ rates which the telephone company will be permitted to charge to its subscribers. The treatment thereby accorded to the affiliates’ over *782 charges is no different than in any other case ‘where the commission and management disagree on the reasonableness of an expenditure, and the management concludes that it is good business judgment to make such payments from its profits despite the fact that it cannot recoup them from its rate payers’. (Pacific Tel. & Tel. Co. v. Public Utilities Comm., 34 Cal. 2d 822, 832, supra; see New Jersey Bell Tel. Co. v. Board of Pub. Utility Comrs., 12 N. J. 568, 592, supra; cf. Southwestern Elec. Power Co. v. Federal Power Comm., 304 F. 2d 29, 47, cert. den. 371 U. S. 924.)” (Matter of General Tel. Co. of Upstate N.Y. v Lundy at 379-380.)
Thus, it is clear that it is perfectly permissible for the PSC, in reviewing a tariff, to undertake an examination of component expenses to ascertain if such expenses are fair and reasonable. If they are not found to be fair and reasonable, the PSC must disregard them in formulating the approved tariff.
Apart from the foregoing, in at least one instance, involving a tariff fixed by contract between a utility and a state agency, it was held that the PSC possessed the requisite authority to disregard the contract between the utility and state agency and direct that the contractual rate be increased. In New York Tel. Co. v State of N.Y., Div. of State Police (85 AD2d 803 [3d Dept 1981], affd 58 NY2d 658 [1982]) the Appellate Division held that the PSC was statutorily authorized, pursuant to Public Service Law § 97 (1), to increase a tariff sua sponte, notwithstanding the fact that the existing rate was prescribed by a contract with the New York State Division of State Police. Again, by way of analogy, the court is of the view that the PSC had full authority to review the contract between DOCS and MCI to determine what portion, if any, of the DOCS commission could be deemed fair and reasonable in view of the business opportunity granted to MCI.
In addition, the court cannot ignore the comment made by the Court of Appeals in its recent decision in this case:
“While the PSC concluded that it did not have jurisdiction over DOCS, it could have determined that MCI’s call rate and surcharge as a whole were ‘unjust, unreasonable or unjustly discriminatory or unduly preferential or in anywise in violation of law’ (Public Service Law § 97 [1]) and ordered them to be lowered. It was reasonable for petitioners to believe that the PSC could have rejected MCI’s rate *783 and surcharges in their entirety, just as, in 1998, it had approved them in their entirety.” (Walton v New York State Dept. of Correctional Servs., 8 NY3d 186, 196 [2007], supra.)
From the foregoing, it is evident that the Court of Appeals believed that the PSC possessed the requisite authority to review the proposed call rates, including the DOCS commission.
Thus, in the court’s view, the proposed rates filed by MCI, which included the DOCS commission, were tariffs subject to review in their entirety by the PSC, which possessed full authority to review the reasonableness thereof as a whole, as it had done in the past. The fact that the Public Service Commission determined to bifurcate the proposed rate, and then declined to review the DOCS portion thereof (while simultaneously directing that the unapproved portion be included in the filed amended tariff) did not operate to transmute the tariff into a tax.
With regard to the petitioners’ argument that the PSC had effectively disapproved the DOCS commission (by finding it to be “nonjurisdictional”), it is the court’s view that the PSC’s failure to fulfill its statutory responsibilities under the Public Service Law did not operate to transform the DOCS commission into a tax. To the extent that it might be argued that the DOCS commission was thereby deemed to be unlawful (since it was not expressly approved by the PSC), collection of the unapproved portion of the tariff could have rendered MCI subject to the enforcement provisions of Public Service Law § 96.[6]
Inasmuch as the Public Service Commission possessed full authority to review the proposed rates to be paid to MCI, it is clear that that portion of the tariff attributable to the commission paid by MCI to DOCS is not a tax, and does not violate NY Constitution, article III, § 1 or article XVI, § 1. Under such circumstances, the court finds (notwithstanding the determination rendered by the PSC), that there is no true controversy, and count II of the petition fails to state a cause of action.
Violation of Due Process Rights (Count III)
The petitioners argue that the single provider/collect call only system unlawfully burdens their due process rights under NY *784 Constitution, article I, §§ 6[7] and 8[8] and constitutes a confiscation- of their property in violation of NY Constitution, article I, § 6.
The court initially observes that the petitioners have made clear that they are not pursuing a procedural due process claim. With regard to substantive due process, as stated in Samuels v New York State Dept. of Health (29 AD3d 9 [3d Dept 2006], affd 7 NY3d 338 [2006]):
“New York’s Due Process Clause provides that ‘[n]o person shall be deprived of life, liberty or property without due process of law’ (NY Const, art I, § 6). Protection for certain fundamental rights is implicit within this crucial constitutional clause (see Hope v Perales, [83 NY2d 563], supra at 575 [1994]). And, in an appropriate case, the protections provided by New York’s Due Process Clause will be afforded a more expansive interpretation than the US Constitution (see Sharrock v Dell Buick-Cadillac, 45 NY2d 152, 159-160 [1978]; see also People v LaValle, 3 NY3d 88, 129 [2004]; Cooper v Morin, 49 NY2d 69, 79 [1979]). A law that impinges upon a fundamental right is subject to strict scrutiny, whereas one that does not ‘burden a fundamental right ... is valid if it bears a rational relationship to [a governmental] interest’ (Hope v Perales, supra at 577).” (Samuels v New York State Dept. of Health at 13.)
The court further notes that at least two courts have found, in situations very similar to the one at bar, that the plaintiffs in those cases failed to raise a substantive due process claim (see McGuire v Ameritech Servs., Inc., 253 F Supp 2d 988, 1004-1005 [SD Ohio 2003];[9] Arsberry v Illinois, 244 F3d 558, 565 [7th Cir 2001]). In the court’s view (as set forth in the court’s discussion of count V, infra), the petition fails to allege facts sufficient to establish the infringement of a petitioner’s rights to freedom of speech or association. In addition, it has been held that the *785 mere fact that inmate families and friends pay comparatively more for telephone calls than members of the public at large does not result in an unconstitutional taking for which just compensation must be paid (see Arsberry v Illinois, supra). Under such circumstances, the court finds that count III fails to state a cause of action.
Violation of the Equal Protection Clause (Count IV)
Count IV alleges a violation of petitioners’ rights to equal protection under NY Constitution, article I, § ll.[10] As stated in Brown v State of New York (45 AD3d 15 [3d Dept 2007]): “ ‘New York courts addressing a state equal protection claim will ordinarily afford the same breadth of coverage conferred by federal courts under the US Constitution in the same or similar matters’ ” (id. at 21, quoting Brown v State of New York, 9 AD3d 23, 27 [2004] [other citations omitted]; see also Samuels v New York State Dept. of Health at 15-16).
With respect to the Federal Constitution, it has been held that the Equal Protection Clause insures that all persons who are similarly situated will be treated alike (see Cleburne v Cleburne Living Center, Inc., 473 US 432, 439 [1985]). Ordinarily, rational basis review is sufficient (see Samuels v New York State Dept. of Health at 16). “[H]owever, [rational basis review] gives way to strict scrutiny for classifications based on race, national origin or those affecting fundamental rights and to intermediate or heightened scrutiny for certain classifications such as gender and illegitimacy” (id. at 16).
Several courts which have dealt with the equal protection issue in cases similar to the one at bar have found that the practice of utilizing a single-provider collect call telephone system which charges a higher rate than rates paid by the general public does not constitute an improper classification for purposes of invoking the Equal Protection Clause (see McGuire v Ameritech Servs., Inc., 253 F Supp 2d 988, 1001 [SD Ohio 2003], supra; Daleure v Commonwealth of Kentucky, 119 F Supp 2d 683, 690-691 [WD Ky, Louisville Div 2000], appeal dismissed 269 F3d 540 [2001]; Gilmore v County of Douglas, State of Neb., 406 F3d 935, 938 [8th Cir 2005]). The underlying rationale is that the recipients of inmate calls cannot be deemed to be similarly situated to members of the public at large. The court agrees. Further, as noted below, the court is of the view that the *786 petition fails to allege facts supporting the infringement of petitioner’s rights. The court finds that count IV fails to state a cause of action.
Violation of Free Speech and Association Rights (Count V)
Count V alleges a violation of petitioners’ rights to free speech and association under NY Constitution, article I, § 8.[11], [12] The court must initially observe that the United States Supreme Court has long recognized rights of inmates and non-inmates to communicate with one another:
“ ‘[P]rison walls do not form a barrier separating prison inmates from the protections of the Constitution,’ Turner v. Safley, 482 U. S., at 84, nor do they bar free citizens from exercising their own constitutional rights by reaching out to those on the ‘inside,’ id., at 94-99; Bell v. Wolfish, 441 U. S. 520 (1979); Jones v. North Carolina Prisoners’ Labor Union, Inc., 433 U. S. (1977); Pell v. Procunier, 417 U. S. 817 (1974). We have recognized, however, that these rights must be exercised with due regard for the ‘inordinately difficult undertaking’ that is modern prison administration. Turner v. Safley, 482 U. S., at 85.” (Thornburgh v Abbott, 490 US 401, 407 [1989]; see also Overton v Bazzetta, 539 US 126 [2003].)
Significantly, a number of courts have found that an inmate does not have a right to unlimited telephone access (see Perez v Federal Bur. of Prisons, 229 Fed Appx 55 [3d Cir 2007]; Washington v Reno, 35 F3d 1093 [6th Cir 1994]; Benzel v Grammer, 869 F2d 1105, 1108 [8th Cir 1989], cert denied 493 US 895 [1989]; Lopez v Reyes, 692 F2d 15, 17 [5th Cir 1982]; Fillmore v *787 Ordonez, 829 F Supp 1544, 1563-1564 [D Kan 1993], affd 17 F3d 1436 [10th Cir 1994]).[13]
In Valdez v Rosenbaum (302 F3d 1039, 1047, 1048 [9th Cir 2002]), a case having close similarities to the one at bar, the court declined to adopt a narrow definition of an inmate’s constitutional right of freedom of speech, that is, framed in terms of telephone access alone. Rather, the court defined such right “sensibly and expansively” as “the right to communicate with persons outside prison walls” (Valdez v Rosenbaum at 1048, citing Pope v Hightower, 101 F3d 1382 [11th Cir 1996]). The Valdez court found no unconstitutional limitation of plaintiff’s right to freedom of speech by reason of limitations on telephone access. In lilies v Maricopa County (2007 WL 1438691, *2, 2007 US Dist LEXIS 35945, *5 [D Ariz 2007]) it was held that “limited telephone access does not rise to the level of a constitutional violation” (see also United States v Footman, 215 F3d 145, 155 [1st Cir 2000] [reciting “prisoners have no per se constitutional right to use a telephone”]; see also Arsberry v Illinois, 244 F3d 558, 564-565 [2001], supra; Roy v Stanley, 110 Fed Appx 139 [1st Cir 2004]). While most of the plaintiffs in the foregoing cases were inmates, the court is of the view that the rights of non-inmates to communicate with inmates of necessity must fall within the contours of the rights possessed by the inmates themselves (who, of necessity, do not enjoy the full panoply of rights afforded by the New York Constitution). In the case at bar, the petition fails to allege facts to support any significant curtailment of the full spectrum of methods of communication available between inmates and their family, friends and attorneys. The narrow issue here has to do with the expense of collect telephone service, for which there is no constitutional guarantee, and which is (or should have been) subject to complete review by the PSC. Within the limited context presented, the court is of the view that the alleged indirect, consequential limitations on telephone access, as set forth in the petition, of themselves, do not rise to a constitutional infringement of petitioners’ rights to freedom of speech or association.
*788 The court concludes that respondents’ motion to dismiss must be granted and the petition dismissed.

. For purposes of the instant discussion, the court will refer to all MCI entities, past and present, including respondent MCI Worldcom Communications, Inc., simply as “MCI.”

. Summaries of their comments are included in the PSC’s order issued on October 30, 2003.

. Before embarking on a discussion of the instant motion, the court hastens to point out that, effective April 1, 2008, it will be unlawful for the Department of Correctional Services to accept or receive revenue in excess of its reasonable operating cost for establishing and administering its inmate telephone system (see Correction Law § 623, as added by L 2007, ch 240, § 2; see also Byrd v Goord, 2007 WL 2789505, 2007 US Dist LEXIS 71279 [SD NY 2007] [dismissing plaintiffs’ complaint as moot]).

. “The legislative power of this state shall be vested in the senate and assembly.”

. “The power of taxation shall never be surrendered, suspended or contracted away, except as to securities issued for public purposes pursuant to law. Any laws which delegate the taxing power shall specify the types of taxes which may be imposed thereunder and provide for their review.”

. The court is equally mindful of respondent’s argument that the PSC had effectively granted de facto approval of the so-called bifurcated rate, through the inclusion of the DOCS commission in the tariff amendments which were filed at its direction, and with its approval.

. “No person shall be deprived of life, liberty or property without due process of law.”

. “Every citizen may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press.”

. The court in McGuire v Ameritech Servs., Inc. {supra) pointed out that substantive due process claims arising out of the First Amendment but brought separately under the Due Process Clause lack merit (id., citing Albright v Oliver, 510 US 266, 273 [1994]).

. “No person shall be denied the equal protection of the laws of this state or any subdivision thereof.”

. “Every citizen may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press.”

. As noted in Curie v Ward (59 AD2d 286 [3d Dept 19.77], mod on other grounds 46 NY2d 1049 [1979]), “[although not specifically enumerated in the Constitution, freedom of association is now considered to be a fundamental right, implicit in the First Amendment to the United States Constitution, as applied to the States through the Fourteenth Amendment (Shelton v Tucker, 364 U.S. 479).” (Curie v Ward at 288.)

. See also United States v Footman (215 F3d 145, 155 [1st Cir 2000]) involving the wiretapping of prison telephones, in which the court found that “prisoners have no per se constitutional right to use a telephone.”